Filed 12/15/25  In re K.J. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re K.J. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>K.J. et al.,<br><br>    Defendants and Appellants. | G065476<br><br>(Super. Ct. Nos. 25DP0192, 25DP0193)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Julie Anne Swain, Judge. Reversed and remanded with directions.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant K.J.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant A.E.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsels, for Plaintiff and Respondent.

No appearance for the Minors.

\*          \*          \*

Mother and Father, the unmarried parents of two very young minors, appeal from a preliminary stage of dependency proceedings involving the minors. Based on Orange County Social Services Agency's (SSA) concerns that mother may have subjected one of the minors to a set of tests at a hospital emergency room based on false accusations that father physically abused the minor, seemingly in an attempt to override a recently revised custody order issued in a pending family law case, the juvenile court made jurisdictional findings declaring the minors dependents of the court pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (j).[1] At the same hearing, the court issued a disposition order granting father full custody, removing the minors from mother's custody and providing her with limited supervised visitation, and requiring mother and father participate in individual therapy and conjoint counseling.

On appeal, mother challenges the sufficiency of the evidence to support the juvenile court's jurisdictional findings. Father argues the court abused its discretion in requiring him to complete individual therapy and joint counseling with mother. We find insufficient evidence to support dependency jurisdiction. Like in many cases involving divided custody, the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

evidence shows mother and father have relationship difficulties and are in need of developing skills that will help them coparent so the minors can thrive. But, currently, there is insufficient evidence to demonstrate the minors are at risk of the type of harm or damage which justifies juvenile court intervention. Accordingly, we reverse the challenged jurisdiction and disposition orders, and we remand the matter with directions to vacate them and all subsequent orders and to dismiss the underlying petitions.

## FACTS

Mother and father were never married but share two biological children, K.J.1 and K.J.2, who were two years old and six months old, respectively, at the time SSA filed the dependency petitions. They have long been embroiled in a custody dispute, with an open family law matter pending in Los Angeles County. Although they equally shared physical custody of the minors at one point in time, a series of family law court orders issued in the weeks leading up to the filing of the petitions changed that status. Specifically, on January 28, 2025, an ex parte order granted father "temporary sole physical custody" of the minors, "with no visitation to [mother] pending [a] future hearing." And an order dated February 10, 2025, which followed the contemplated future hearing, awarded father "primary physical custody" of the minors, with mother granted "visitation on alternating weekends from Saturday at 10:00 AM to Sunday at 5:00 PM."

## I.

### INITIAL CONTACT WITH SSA

On February 15, 2025, the start date of the newly ordered visitation period, the minors were provided to mother. The following day, SSA responded to Children's Hospital of Los Angeles (the hospital) in response to a report from mother. According to mother, K.J.1 immediately

3

started complaining of stomach pain when her time with the minors began the day before, and the complaints continued through the day and night, and into the morning. When she initially asked whether K.J.1 had fun at father's house, K.J.1 said father hit her in the stomach. And in the morning, K.J.1 supposedly told mother "'daddy hurt me.'" Mother told SSA she did not want father to know where they were because she was fearful he would harm K.J.1 for saying he hurt her.

With mother's permission, SSA and a hospital social worker met with K.J.1 outside mother's presence. She was in tears and responded to questions about what happened by saying "'daddy hurt me.'" However, K.J.1 could not articulate how father hurt her or where she was hurt.

After hearing from mother, a doctor ordered non-accidental trauma testing of K.J.1, which included a CT scan, skeletal survey, blood work, and urine analysis. Mother had to physically restrain K.J.1 while hospital staff inserted an IV and drew blood because K.J.1 was screaming and fighting staff, saying she "had no 'ouchies.'" K.J.1 cried herself to sleep thereafter.

When father arrived at the hospital for his custodial time, "mother became very agitated" and asked why he would be allowed to stay with K.J.1 when K.J.1 was saying he hurt her. SSA informed mother it was his custodial time and mother eventually left. Father got K.J.1 to calm down when she woke up. While playing, she walked up to SSA multiple times to show her IV and said "'[d]addy hurt me.'" This gave SSA the impression K.J.1 "had been told to say '[d]addy hurt me' when she felt pain."

Before being released after roughly 12 hours at the hospital, K.J.1 underwent a CT scan and skeletal survey. She had to be swaddled and strapped down initially, but father's assistance led her to calm down and

4

hospital staff removed the straps halfway through the survey. During K.J.1's testing, K.J.2 became overstimulated and tired. Father was able to rock him to sleep after two hours of crying.

Ultimately, doctors reported all K.J.1's tests were negative and she had no injuries. SSA notified mother. Mother requested K.J.1 undergo a psychological evaluation, "but not that night because [K.J.1] needed to sleep."

On February 18, mother notified father she would be requesting emergency family law orders for full custody of the minors. She also told SSA she would be reporting the situation to police.

The next day, SSA successfully sought a protective custody warrant to remove the minors from mother's custody and leave them in father's care. The application expressed concern that mother "would continue to make allegations against . . . father about him harming [K.J.1,] causing her to go through traumatic tests and survey[,] or that . . . mother would cause injury to the children and place blame on the father." SSA indicated there was a high risk of "severe psychological/emotional harm."

## II.

### DEPENDENCY PETITION AND DETENTION

A dependency petition filed two days later, on February 21, alleged the minors fell within the juvenile court's jurisdiction due to a failure or inability of mother to protect them, an inability of mother to provide them with regular care due to mental illness, the suffering or substantial risk of suffering serious emotional damage, and a substantial risk K.J.2 would be abused or neglected based on mother's actions toward K.J.1. Among the factual allegations were what took place at the hospital and the following: (1) mother and father were "engaged in a contentious custody battle over the [minors]"; (2) three days prior to the January 2025 ex parte order removing

5

the minors from her physical custody, mother accused father of hitting K.J.1 in the stomach; (3) "mother stated that she knew the father would not hurt [K.J.1]"; (4) father believed mother was coaching K.J.1 to say he hurt her so mother could get custody of the minors; (5) father reported mother has a history of not complying with custody orders; (6) father and mother have a history of domestic violence, including a 2022 incident which resulted in a Los Angeles County dependency case which terminated in August 2024; (7) mother may have undiagnosed and/or untreated mental health issues; (8) father has a history of domestic violence with the mother of the minors' paternal half sibling; and (9) father has a history of substance abuse.

A simultaneously filed detention report provided similar factual background and expressed the same SSA concerns. It further indicated SSA believed the physical abuse allegations against father were unfounded, but the emotional abuse and general neglect allegations against mother were substantiated. Regarding the impact of removal of the minors from mother's custody, the report stated the impact would be minimal because mother only had visitation every other weekend and SSA would work to facilitate weekly monitored or supervised visits with her. SSA recommended six hours of monitored visitation per week.

At the detention hearing on February 24, mother and father denied the petition's allegations. After hearing from counsel for all parties, including minors' counsel, the court adopted SSA's recommendation of physical custody to father and six hours of weekly monitored visitation for mother. One of the protective orders required mother to immediately notify father and SSA if she scheduled any medical appointments for either of the minors.

6

*A. SSA Report and Addendum*

A jurisdiction and disposition report filed March 24, stated the minors "appeared happy and comfortable in father's care." At SSA's suggestion, mother was enrolled in parent education and individual counseling The report also detailed SSA's interviews with father, mother, and the minors' paternal grandmother, with whom K.J.1 had lived during the pendency of the prior Los Angeles County dependency case.

Father told SSA mother has a history of lying and falsely accusing him of things, including physically hurting K.J.1 and having substance abuse issues, as well as not complying with the family law court's custody-related orders. He said the social worker in the Los Angeles County dependency case "allowed . . . mother to get away with everything" and always sided with her, and he expressed concern mother may have mental health issues. Additionally, father admitted the prior domestic violence allegations, explaining he had completed all required classes from which he learned a lot. Regarding the then-existing situation, father said he wanted the dependency case to close and have the family law court visitation orders go back into effect because "the whole situation ha[d] caused a lot of emotional distress [to] the family."

Mother told SSA that on two prior occasions, one in December 2024 and one in January 2025, K.J.1 complained to her that father hit her in the stomach area. She reached out to father both times; the first time, father said "he was not going to get into it with her," and he did not respond the second time. Mother denied coaching K.J.1 to say father hurt her and said she felt like she was doing what she was supposed to do as a parent.

7

Likewise, she denied having any mental health issues, conveying the therapist she saw during the Los Angeles County dependency case "did not feel she needed a mental health evaluation."

The paternal grandmother told SSA that mother "'was a lot, definitely a lot' to deal [with] during the time she had [K.J.1] in her care." "[M]other was changing the times of scheduled visits, showing up whenever she wanted to, calling law enforcement to do welfare checks on [K.J.1], and not returning [K.J.1] after scheduled visits." She further expressed confusion as to why mother would be disrespectful toward her and call her names when all she was trying to do was care for K.J.1, and she denied ever seeing father physically discipline his kids or otherwise "put his hands on [them]."

The report also included information on SSA's interactions with each parent. Father was unwilling to transport the minors to their scheduled visits with mother even though the location was closer than their regular custody exchange location under the family law court orders, but he said he would have them ready for transport. Mother expressed frustration that father was refusing to allow the minors to bring toys and clothes purchased by her back to his house.

Based on the overall circumstances, the report recommended the juvenile court sustain the petition's allegations, find jurisdiction, maintain placement of the minors with father and visitation to mother, and set a six-month review hearing. SSA continued to be concerned "mother may have guided [K.J.1] to report injuries resulting in unnecessary emotional trauma to [K.J.1]" and "several medical procedures which may have been unnecessary."

An April 2025 addendum to the jurisdiction and disposition report detailed further interactions between SSA and each of the parents.

Father expressed frustration with how the dependency process was affecting his household, said he would not allow mother to have phone or video calls with K.J.1 unless they were court ordered,[2] and made clear he did not want mother to send the children to his house with gifted clothes or toys. After one visit with mother, father sent back a new dress and doll mother gifted to K.J.1 for her then upcoming birthday. Mother expressed frustration with not being able to talk to the minors between the weekend in-person visits and being forced to keep with her any items she gifted to them, accused father and his girlfriend of speaking bad about her based on certain things K.J.1 said during visits, and showed concern for K.J.1's emotional well-being based on repeated comments by K.J.1 that she wanted to go to mother's house. The addendum maintained the same SSA recommendation.

*B. Hearing*

At the jurisdiction and disposition hearing, the juvenile court heard testimony from mother, father, and the assigned SSA social worker. Mother requested to call K.J.1 to testify. However, based on attempted competence assessments by the court and minors' counsel, during which K.J.1 would not answer any questions, the court disqualified her from being a witness.

Mother testified she made the initial contact with SSA because K.J.1 told her "father hurt her in her tummy," as she had on two other occasions in the prior two months. She reached out in writing to father on both prior occasions to clarify what happened. The first time, father did not

---

[2] Mother tried to resolve this issue by seeking an ex parte order to allow her two weekday phone calls with the minors. The juvenile court denied the request.

respond. The second time father "became defensive" and "threatened to send police officers by [her] house to come get the kids." Because she felt abuse allegations against father were "big allegations to put on [him]," mother opted to not mention either of the first two occasions to anyone other than father. On the third occasion, K.J.1 "looked bad" and "wasn't wanting to eat anything [or] do anything, and . . . had been complaining about stomach pain for a while." Although mother never observed any marks on K.J.1, she was concerned for her safety given the repeated complaints. She contacted an emergency child abuse hotline, which in turn connected her with SSA. Based on details relayed by mother, SSA told mother to take K.J.1 to the hospital because of the potential for internal bleeding. At the hospital, the doctors ordered all of the tests performed on K.J.1.

When asked whether she told K.J.1 to say "[d]addy hurt me or anything to that effect," mother denied ever doing so. In response to questions about why she did not contact SSA or make the family law court aware after the first two occasions, mother explained "these are big allegations to put on somebody; so before [she] contacted anybody, [she] wanted to get clarification from . . . father himself." And, although mother initially testified she feared father would hurt K.J.1 after he found out K.J.1 said he hit her, she later testified she was only concerned about the minors' emotional safety, not physical safety, when they were with father.

Father denied ever hitting K.J.1 in the stomach or using physical discipline, and he said she never told him that he hurt her. He said he did not respond to mother's messages about the first two occasions of K.J.1's complaints because mother "has a pattern of just creating stuff just to create it and cause problems." In addition, he expressed his belief that mother was always trying to get him in trouble, "just trying to trip [him] up in the race."

10

When asked about any concerns regarding mother's ability to care for the minors, he said he was concerned about "[h]er instability." He elaborated: "You know, she goes from place to place. She is never in one place at one time. Job to job, car to car. You know, they are always – traveling with them on the bus a block away from skid row"

The assigned social worker testified the current emotional abuse allegations stemmed from mother's "history of unreliable reporting," noting the three times mother alleged father physically abused K.J.1. He explained that "for some weird coincidence, all of these allegations tend to come up right before or after important [family law] court dates." When asked by mother's counsel if he thought mother was falsely accusing father on all three occasions, he said: "I guess that's where it's like the unknown. Right? So I don't believe the mom is falsely accusing the father, but, also, I don't know what [K.J.1] relayed or did not relay to mom because [K.J.1] is . . . not of [an] age where you can get that kind of information, no matter how simple or age-appropriate the questions are." He expressed similar uncertainty about the root cause of another statement by K.J.1 about father hurting her, made during a March 2025 supervised phone call between mother and K.J.1. When asked whether he believed mother was coaching K.J.1 to say such things, he replied: "I wouldn't be able to answer that. I don't know what [K.J.1] was thinking at the time. Mo[ther] wasn't there physically for sure next to her, but I couldn't tell you that maybe something triggered it. But, like I said, it's just the unknown."

Regarding the situational status at the time of the hearing, the social worker said SSA was no longer actively investigating the allegations against mother because of the inability to communicate with K.J.1. When asked for SSA's investigatory conclusion, he stated: "We don't–there is no–I

11

don't really know how to answer that." He confirmed mother's visits with the minors had been "positive, beneficial, and appropriate." Nevertheless, he indicated SSA was concerned "the same pattern will continue," elaborating: "I wouldn't able to tell you exactly if it would happen in like a week, like two weeks, but I think sometime down the line, like we are worried that the same allegations or unreliable reporting will come up again." Mother's counsel inquired how such a possibility posed a risk to the minors and the social worker responded: "I mean, at this time, it doesn't pose a risk to the kids. . . . [¶] . . . [¶] My testimony today is to back up the recommendation of family maintenance to the father and enhancement services to the mother. And for me, I can only go back to whatever–I'm–from my point of view, it was never 50-50 [family maintenance] between mom and dad after the last family court hearing. So like in my thinking, it's to work back to the every other weekend visits for mom. [¶] And I'm saying this because–so if family law makes orders and if mom is able to kind of go about this and open up a case against dad in juvenile court, I'm afraid that other families will utilize this same thing. And it's like, okay, family law–they didn't get what they want in family law, let's take it to juvenile court and get a different outcome. [¶] If it was [family maintenance] to mom and dad prior to this case opening, we wouldn't have a problem with joint [family maintenance], but that wasn't the case at this time prior to this case opening."

On cross-examination, the social worker explained part of the ongoing concern stemmed from the fact SSA had not yet been able to get any information from mother's therapist about her visits and progress. Although he connected with the therapist, and mother signed a limited release to enable the therapist to share some type of information (the scope of which was unknown), the status update needed to be approved in accordance with

12

the therapist's employer's policy before he could receive it. The social worker confirmed it would be helpful to get that information before he "would feel ready to liberalize mother's visitation."

Regarding father, the social worker agreed the minors appeared comfortable with him and in his home. Although he recognized father had a strong family and friend support system, he felt father could benefit from counseling for at least two reasons. First, he believed father had been through traumatic experiences with mother during the prior three to four years. Second, he believed both parents needed to improve their communication with one another because they were solely communicating through the social worker, and father gave the impression "he would rather depend on somebody else and have them intervene" than handle things himself.

*C. Juvenile Court's Decision*

After hearing argument from all parties, the juvenile court took the matter under submission and issued a ruling a few days later. Although much of its ruling was articulated orally to the parties, the court stated it would be issuing a written decision and that its ruling consisted of both the on-record comments and the written decision.

Orally, after finding the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) did not apply, the court found true certain of the petition's allegations, struck other allegations, and found jurisdiction over the minors under section 300, subdivisions (b) and (j). The allegations found true, which were listed within failure to protect (*id.*, subd. (b)) and abuse of sibling (*id.*, subd. (j)) categories, consisted of the following: (1) K.J.1 "has suffered and/or is at substantial risk of suffering serious emotional damage and physical harm in the care of . . . mother"; (2) the minors "are at substantial risk of

13

suffering serious emotional damage"; (3) mother and father "have a history of domestic violence, which resulted in [K.J.1] being removed from their care by the Los Angeles County [f]amily [c]ourt"; (4) mother "may have undiagnosed and/or untreated mental health issues"; and (5) K.J.2 is the sibling of K.J.1, the latter of whom was previously declared a dependent of the juvenile court in Los Angeles County based on allegations involving father and a half sibling. The stricken allegations, which were listed within failure to protect (*id.*, subd. (b)) and emotional harm (*id.*, subd. (c)) categories, included: (1) father "has a history of domestic violence" with the mother of the minors' paternal half sibling; (2) father "has a history of substance abuse issues"; (3) K.J.1 "has suffered and/or is at substantial risk of suffering serious emotional damage and physical harm in the care of . . . mother"; and (4) the minors "are at substantial risk of suffering serious emotional damage."

Regarding disposition, the court concluded returning the minors to mother's care would be detrimental because there was "clear and convincing evidence of substantial danger to [their] physical health, safety, protection, or physical or emotional well-being." It ordered the minors to remain in father's care under a family maintenance plan, with enhancement services, a minimum of six hours in-person supervised weekly visitation, and a minimum of two weekly video calls with K.J.1 to mother. Other aspects of the ordered case plan included, inter alia, individual counseling and conjoint counseling for both parents, with the latter to emphasize coparenting.

In reaching its decision, the court said it was "left with significant doubts about mother's reported statements during the social services' investigation and testimony in court." Among its orally stated factual findings were the following: K.J.1 underwent "unnecessary and burdensome medical treatments and evaluations [at the hospital], timed to

14

interfere with the beginning of . . . father's custodial time under the new family law orders"; mother "attempted to prevent the staff from notifying or contacting . . . father to alert him to the child's hospital visit"; "father did not inflict any physical harm on either child and all reports of harm to [K.J.1] by . . . father are unfounded"; "[a]bsent mother's actions and behavior, the [minors] would not have been removed from her care"; and "each parent ha[d] contributed to the current coparenting tension and parental conflict."

The court's subsequent written decision, provided as a minute order, contained its oral pronouncements and some additional findings not mentioned at the in-person hearing. Those additional findings included, inter alia, "that reasonable efforts were made to prevent or eliminate the need for removal of the [minors] from mother's home" and "vest[ing] custody with . . . father is required to serve the [minors'] best interest[s]."

Mother and father each timely appealed from the disposition orders.

DISCUSSION

Mother challenges the juvenile court's jurisdictional findings, arguing there is insufficient evidence to support any of them. Father does not challenge the court's jurisdiction over the minors, instead contending the individual therapy requirement imposed on him as part of the court's disposition orders is unwarranted.[3] For the reasons we explain, we agree the

---

[3] Father's original briefing also challenged a provision of the disposition orders which required him to participate in conjoint counseling with mother. At father's request, we granted judicial notice of a subsequent court order which eliminated the conjoint therapy component. All parties agree that order rendered moot the conjoint therapy portion of father's appeal.

15

court's jurisdictional findings are not supported by substantial evidence, a conclusion that necessitates reversal of the challenged orders and all subsequent orders.

I.

JURISDICTION

The juvenile court found jurisdiction over the minors pursuant to section 300, subdivisions (b) and (j). After providing some background on the relevant law, we address each finding in turn, including the sustained allegations on which they were based.

*A. Relevant Law, Generally, and Standard of Review*

The opening clause of section 300 provides: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court." The subdivisions that follow describe children who may be adjudged dependents of the court. Among them are the three categories pursuant to which the petition's allegations in this case were made subdivisions (b), (c), and (j).

Subdivision (b) of section 300 speaks to situations in which a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness," due to specified circumstances. Those circumstances include, among others: (1) a parent's failure or inability to adequately supervise or protect the child; or (2) a parent's inability to provide regular care for the child due to the parent's mental illness. (*id.*, subd. (b)(1)(A) & (D).)

Subdivision (c) of section 300 is implicated when a "child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression,

16

withdrawal, or untoward aggressive behavior toward self or others," as a result of a parent's actions.

Subdivision (j) of section 300 concerns a child whose sibling has been abused or neglected and there is a substantial risk the child will, themselves, be abused or neglected.

In the juvenile court, SSA bears the burden of proving by a preponderance of the evidence that a child is a person described by section 300. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) "'[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent.'" (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308.)

On appeal, we review the juvenile court's jurisdictional findings for substantial evidence. (*I.J., supra,* 56 Cal.4th at 773.) That is, we look to whether there is contradicted or uncontradicted evidence that is reasonable, credible, and of solid value supporting the court's findings. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the [juvenile] court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the [juvenile] court." [Citation.] "We do not reweigh the evidence or exercise independent judgment."'" (*I.J.,* at p. 773.) Although one valid jurisdictional finding is enough to declare a child a dependent (*In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*)), we may exercise our discretion to review all challenged findings if, for example, the findings "'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' . . . '"could have other consequences for [the appellant], beyond

jurisdiction,"'"" or are "based on particularly pernicious or stigmatizing conduct" (*id.* at pp. 285–286).

*B. Analysis*

1. Allegation b-1

Allegation b-1 of the petition stated K.J.1 "has suffered and/or is at a substantial risk of suffering serious emotional damage and physical harm" in mother's care. The juvenile court sustained this allegation and found it established jurisdiction under subdivision (b) of section 300. We conclude this was error for two reasons, one concerning the physical harm aspect, and the other concerning the emotional harm aspect.

Regarding physical harm, "appellate courts have repeatedly stressed, "'[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child [has suffered, or] is exposed to a *substantial* risk[,] of *serious physical* harm or illness.""" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111 (*Jesus M.*).) The terms "serious physical harm" and "substantial risk" are not statutorily defined, but their plain meaning can be gleaned from the words employed. Given the context, "serious" means "excessive . . . in quality, quantity, extent, or degree." (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/serious, par. 5> [as of Nov. 24, 2025] archived at: <https://perma.cc/SK5X-ZFWE>.) And "substantial risk" does not connote just any risk. The risk that serious physical harm will reoccur must be considerable and not speculative. (See *In re Emily L.* (2021) 73 Cal.App.5th 1, 15; Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/substantial, par. 3b> [as of Nov. 24, 2025] archived

18

at: < https://perma.cc/E5ZD-5TCV > [defining "substantial" as "considerable in quantity: significantly great"].)

Here, the juvenile court found K.J.1 was subjected to "unnecessary and burdensome medical treatment and evaluation for suspected injury or abuse that never happened." Consistent with the petition's allegations, this was the sole apparent basis for the court's physical harm finding. While we must defer to the court's factual determination that the testing and evaluation was unnecessary (*I.J., supra*, 56 Cal.4th at 773), we must separately determine whether a one-time exposure to a CT scan, skeletal examination (i.e. a specific series of x-rays), blood draw, and urine analysis is sufficient to uphold a finding of serious physical harm or a substantial threat of such harm. On the record before us, we conclude it does not.

Blood and urine testing are routine medical procedures, as are x-rays. (See *Schmerber v. California* (1966) 384 U.S. 757, 771 & fn. 13.) Although a CT scan is a more specialized procedure, like an x-ray, it is considered noninvasive. (See Bitz et al., *Incompetence in the Brain Injured Individual* (1999) 12 St. Thomas L. Rev. 205, 237, fn. 224.) Exposing a child to such noninvasive and routine medical procedures on a single occasion cannot amount to serious physical harm which justifies juvenile court involvement. This holds true in this case even though there was evidence K.J.1 cried and screamed during some of the procedures, and she had to be strapped or held down for others. It is unsurprising a two-year-old might find the poke of a needle painful or be unable to keep still enough for x-rays and a CT scan, especially when in an unfamiliar hospital setting with unfamiliar people performing tests to which the child may have not previously been

19

exposed. Those circumstances do not convert what took place into severe physical harm.

Notably, while SSA's briefing on appeal mentions "serious physical harm" when quoting subdivision (b) of section 300, it does not argue the testing K.J.1 underwent amounts to that level of harm. Nor does it point to anything else constituting serious physical harm. Instead, it focuses on the emotional damage it believes K.J.1 sustained as a result of the testing.

Turning to potential future harm, there is likewise insufficient evidence to show a substantial risk of serious physical harm. There is no pattern of mother repeatedly submitting K.J.1 to unnecessary medical testing, and there is no evidence suggesting, without speculation, that she will do so in the future. Indeed, at the time of the jurisdiction and disposition hearing, the social worker testified the current risk with which SSA was concerned was the possibility mother would make unfounded accusations against father or "coach" the minors. He expressly testified SSA was not concerned about physical abuse of the minors by mother. Similarly, father did not express any concerns relating to the minors' physical safety when asked whether he had concerns regarding mother's ability to care for them. "'[A] single act of questionable parenting, without evidence it could recur and place the child at substantial risk of serious harm or illness, does not under the evidence in this case justify the exercise of jurisdiction under section 300[, subdivision] (b).'" (*In re C.F.* (2011) 198 Cal.App.4th 454, 461.)

As for emotional harm, such harm, no matter how serious, does not provide a basis for jurisdiction under subdivision (b) of section 300. (*Jesus M., supra*, 235 Cal.App.4th at p. 112; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 718 (*Daisy H.*), disapproved of on other grounds by *D.P., supra*, 14 Cal.5th at p. 278.) Notably, the identical allegation and supporting factual

20

basis was included in the petition as establishing jurisdiction under section 300, subdivision (c), a subdivision that *does* concern emotional harm. But, the juvenile court struck that allegation and did not find jurisdiction under subdivision (c). Both parties overlook this fundamental error, instead focusing on whether substantial evidence supports the court's emotional harm finding.

Even if the juvenile court had found jurisdiction under section 300, subdivision (c), the evidence regarding mother's accusations of physical abuse against father and the hospital visit would be insufficient to support it. To establish jurisdiction under subdivision (c), there must be evidence of the child exhibiting "severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others." (*Ibid.*; *In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 (*Alexander K.*).) There was no such evidence in this case. Rather, the only psychological related evidence showed father took K.J.1 for a therapy intake appointment about a month after the hospital visit, and staff determined "[t]herapy was not recommended for further [t]reatment." And, notwithstanding any supposed coaching of K.J.1 by mother, SSA reported K.J.1 was "extremely comfortable and happy" in father's home.

SSA argues K.J.1 "experienced emotional distress" as a result of the "unnecessary medical procedures," which manifested in K.J.1 crying and screaming during the procedures, and not being herself for the following two days. While there undoubtedly is evidence K.J.1 had an emotional reaction to what took place at the hospital, none of it rises to the level necessary to justify juvenile court intervention based on serious emotional damage.

Regarding risk of serious emotional damage, there likewise is insufficient evidence to show a substantial risk of such damage. Based on the

21

record, it appears the concern about future emotional damage stemmed from the possibility mother might (1) coach K.J.1 to say negative things about father so mother could use the statements in the custody battle pending in Los Angeles County family court, and (2) make unreliable or unfounded reports about father vis-à-vis the minors.

As for future reports by mother about father, the social worker who testified at the jurisdictional hearing said it was "unknown" whether mother falsely accused father in the past. And in relaying SSA's concern that "the same allegations or unreliable reporting will come up again," he conveyed he "wouldn't [be] able to tell . . . exactly if it would happen in like a week, like two weeks, but [he thought] sometime down the line." He also testified part of SSA's concern about the future stemmed from the lack of any information from mother's therapist; he confirmed SSA wanted to obtain that information before making any recommendations concerning custody changes. Such speculation and absence of evidence about the potential recurrence of behavior is insufficient to support a substantial risk finding. (See *In re Roxanne B.* (2015) 234 Cal.App.4th 916, 920 (*Roxanne B.*).) This is underscored by the social worker's response to a question about how the possibility of future allegations or unreliable reporting by mother posed a risk to the minors: "I mean, at this time, it doesn't pose a risk to the kids."

Equally unsupported is a risk finding grounded in the possibility mother might coach K.J.1 to gain an upper hand in the family law custody battle. First, the juvenile court did not make an express finding that mother coached K.J.1 in the past, and none of the allegations which it sustained specifically spoke to coaching. Instead, the court made the general statement that it was left with doubts about mother's statements and testimony. Additionally, the testifying social worker said he did not know how to answer

22

a question about SSA's investigatory conclusion because, other than mother, the only person to ask about what had transpired was then two-year-old K.J.1, who was unable to answer any questions due to her age. With an inconclusive investigatory conclusion and lack of a court finding about the past, the possibility of future recurrence is more conjectural in nature.

Second, there is no evidence in the record linking the alleged coaching to the type of serious emotional damage defined in the statute (e.g. severe anxiety, depression, withdrawal). While we recognize a juvenile court does not have to wait for serious damage to occur before intervening (*In re N.M.* (2011) 197 Cal.App.4th 159, 165), there must be evidence showing there is a substantial risk of serious emotional damage to justify a jurisdictional finding under section 300, subdivision (c), based on the possibility of future damage. This requires evidence demonstrating how identified parental behavior may lead to such damage. While it may be apparent that coaching a child to make inaccurate statements about one parent could have psychological consequences on the child, it is not self-evident that such behavior may lead to severe anxiety, depression, withdrawal, or untoward aggressive behavior. Without evidence of a current manifestation of such damage or evidence linking a parent's behavior to the possibility of such damage in the future, there is insufficient evidence to support a finding of substantial risk of serious emotional damage.

As another court has observed with respect to section 300, "[i]t is clear from the overall [statutory] scheme that the parental conduct branch of subdivision (c) seeks to protect against *abusive* behavior that results in severe emotional damage. We are not talking about run-of-the-mill flaws in our parenting styles—we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms

23

identified in the statute." (*Alexander K., supra*, 14 Cal.App.4th at p. 559.) While mother's purported behavior may not be run-of-the-mill in a situation involving married parents, it is all too frequent in situations involving an ongoing custody battle between separated parents. Where, like in this case, there is insufficient evidence to demonstrate actual serious emotional damage or a substantial risk of such damage, a jurisdictional finding under section 300, subdivision (c) cannot withstand scrutiny. Thus, even if the juvenile court had found emotional damage, or the risk thereof, supported jurisdiction over the minors pursuant to subdivision (c), we could not let the finding stand.

2. Allegation b-2

Allegation b-2 of the petition stated the minors "are at substantial risk of suffering serious emotional damage" based on what the supporting factual basis described as "a contentious custody battle" between mother and father over the minors. A finding of jurisdiction under section 300, subdivision (b), based on the sustaining of this allegation is flawed in ways similar to the jurisdiction finding based on allegation b-1.

First, the juvenile court erred by finding jurisdiction under subdivision (b) of section 300, based on emotional harm or the risk thereof. Subdivision (b) concerns physical, not emotional, harm. (*Jesus M., supra*, 235 Cal.App.4th at p. 112; *Daisy H., supra*, 192 Cal.App.4th at p. 718.)

Second, even if viewed from the standpoint of subdivision (c) of section 300, there is insufficient evidence to uphold a jurisdictional finding. Again, there is no evidence K.J.1 has sustained the statutorily described type of emotional damage. Likewise, there is no evidence K.J.2, who was only eight months old at the time of the jurisdictional hearing, has sustained such

24

damage. Indeed, SSA observed each child to be happy and thriving at father's home and during visits with mother.

As for the risk of serious emotional damage based on the parents' ongoing custody dispute, we find insufficient evidence to justify the present juvenile court intervention. The record contains a variety of evidence demonstrating mother and father's coparenting difficulties, ongoing custody disagreements, and reliance on intermediaries to communicate with one another. And although the social worker testified SSA's concern at the time of the jurisdictional hearing related to potential past and future false allegations against father and coaching of K.J.1 by mother, SSA's jurisdiction and disposition report confirmed "there is no line of communication between . . . mother and . . . father." Accordingly, it expressed SSA's belief that both "need to learn how to properly communicate effectively in order to co-parent for the sake of their children."

While proper, or even simply functional, coparenting is a laudable goal, the achievement of which will benefit all involved, SSA's concern and the evidence on which it was based does not justify dependency jurisdiction. Stated differently, although mother and father's custody dispute and related coparenting troubles have the potential to negatively impact the minors on an emotional level, the record does not show the potential impact, or risk of it, is great enough to warrant juvenile court intervention at this time. (See *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1376 (*Brison C.*) [concluding record did not support dependency jurisdiction over child "caught in the crossfire of his [divorced] parents' frustration and anger with each other"].)

3. Allegation b-3

Allegation b-3 of the petition stated mother and father "have a history of domestic violence, which resulted in [K.J.1.] . . . being removed from their care" in a Los Angeles County dependency case.

Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b). (See *In re R.C.* (2012) 210 Cal.App.4th 930, 941.) However, it may do so only if there is evidence "the violence is ongoing or likely to continue and . . . it directly harmed the child physically or placed the child at risk of physical harm." (*Daisy H., supra*, 192 Cal.App.4th at p. 717; see also *In re B.H.* (2024) 103 Cal.App.5th 469, 482.) This is consistent with the overarching question under section 300 which is "'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'" (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.)

Here, while it appears mother and father's relationship has been mired in domestic violence in the past, the evidence showed the most recent incident occurred almost two years before the filing of the instant petition, in April 2023. A Los Angeles County dependency case was pending at the time, but it was later closed in August 2024 after mother and father reunified with K.J.1, having completed the court-ordered case plan. Among the programs completed by father were individual counseling, parenting classes, a 52-week domestic violence program, anger management, and random drug testing. Mother completed individual counseling, parenting classes, and a domestic violence victim support group.

Given the lack of evidence regarding recent domestic violence, the completion of services in the Los Angeles County dependency case which ended roughly six months before the circumstances giving rise to the instant petition, and the fact that mother and father's current relationship is limited

26

to coparenting the minors, there was no evidence of an ongoing risk of domestic violence. Accordingly, there was insufficient evidence to support the juvenile court's jurisdictional finding based on a history of domestic violence.

4. Allegation b-4

Allegation b-4 stated mother "may have undiagnosed and/or untreated mental health issues." Mother argues there was no evidence of any mental health problems or any evidence linking one to actual harm or a substantial risk of harm to the minors. We agree there was no substantial evidence to support a finding that mother may have mental health issues.

The only evidence touching on mental illness came from father who told SSA he believed mother may have a mental illness. Such speculation is not substantial evidence of a mental illness. (See *Roxanne B., supra*, 234 Cal.App.4th at p. 920.) While there was evidence mother participated in individual counseling in the past and was seeing a therapist at the time of the jurisdiction and disposition hearing, the court was not provided with any related reports or information. In fact, SSA stated it was unable to obtain any information from mother's current therapist before the hearing because the therapist needed to get approval from a supervisor before releasing it.

SSA argues that "in the context of other allegations about [m]other's seemingly erratic behavior which had placed her child at risk, information suggesting that this behavior might be due to untreated mental health issues supports the court's [jurisdictional finding]." Tellingly, SSA does not specify what information suggested mother's behavior might be due to mental illness. To the extent it relies on factual assertions listed in the petition as supporting the mental illness allegation, the reliance is unavailing. The petition said (1) "mother was observed to be agitated when

27

discussing custody issues involving father"; (2) "mother agreed to an invasive medical work up for [K.J.1]"; (3) "mother state[d] that she knew . . . father would not hurt [K.J.1], but that she was fearful that he would harm [K.J.1] for saying that [he] hurt her"; and (4) in making revised custody orders shortly before the events giving rise to the petition, which resulted in father having primary custody, "the Los Angeles [f]amily [c]ourt considered . . . mother's 'instability.'" Without more, none of these evidence a mental illness. (*In re David M.* (2005) 134 Cal.App.4th 822, 828 [""*inferences that are the result of mere speculation or conjecture cannot support a finding*""], abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622.) Notably, the minute order mentioning mother's "instability" as a factor in the family court's decision does not elaborate on the meaning. Mother was the only one who testified as to its meaning, stating it related to father saying she lived in her car with the minors.

In sum, there is insufficient evidence to support the juvenile court's jurisdictional finding based on mental illness.

5. Allegation j-1

Allegation j-1 stated K.J.2 was at a substantial risk of abuse or neglect based on abuse or neglect of K.J.1. However, rather than being based on the circumstances that immediately preceded this case, including K.J.1's hospital visit, the petition's supporting factual basis concerned the former Los Angeles County dependency proceeding which began in June 2022 and ended in August 2024. The genesis of that case was domestic violence between father and the mother of the minors' halfsibling, with domestic violence between father and mother playing into how the proceeding evolved. With insufficient evidence in this case to support a jurisdictional finding under section 300, subdivision (b), based on domestic violence, there is

28

insufficient evidence to support the juvenile court's jurisdictional finding under section 300, subdivision (j), which is grounded in a closed dependency proceeding related to past domestic violence. And because there are no adequately supported jurisdictional findings involving K.J.1 in this case, the court's subdivision (j) finding is erroneous.

*C. Conclusion*

Without any sufficiently supported jurisdictional finding, the juvenile court's finding of jurisdiction over the minors must be reversed.

Given the record before us, we find it important to comment on the "big picture" of what appears to have occurred in this case. What started as a potential dependency case based on allegations of physical abuse by father, quickly evolved into a dependency case focused on alleged harm or risk of future harm caused by mother's alleged false reporting of abuse and coaching of K.J.1. In the two months after the minors were removed from mother pursuant to a protective custody warrant, SSA's investigation led to a handful of unknowns and no apparent conclusion. But an ongoing concern about possible emotional harm at some unknown point in the future, along with the presence of mother and father's ongoing custody dispute and their relationship difficulties, led to SSA advocating for the juvenile court to find jurisdiction and put in place a case plan which included various counseling and coparenting class requirements, and maintained father's full physical custody of the minors with limited supervised visitation to mother. It appears SSA was also troubled that mother may have been attempting to use SSA and the juvenile court to get around the family law court's custody orders.

A reminder about two key dependency principles is important under these circumstances. One, "'the juvenile courts must not become a battleground by which family law war is waged by other means.'" (*In re*

29

*Christopher C.* (2010) 182 Cal.App.4th 73, 85; see also *Brison C., supra*, 81 Cal.App.4th at p. 1382.) This generally applies to parents, like mother and father, but it also has meaning for SSA and courts. While there are sometimes circumstances that necessitate simultaneous family law court oversight and juvenile court intervention, it is critical the latter only take place when the circumstances meet the statutory requirements for dependency jurisdiction. (See *Brison C.*, at p. 1382 ["'[I]f parents' poor communications skills and distrust established a need for [juvenile court intervention, it] could assume or continue jurisdiction in virtually every family law case involving custody or visitation issues'"].) In all other situations, the matters should properly be left for handling by the family law court, which is equipped with a plethora of options for managing the complex issues with which it is presented on a regular basis. (See *id.* at p. 1382 & fn. 7.) Here, there is an active family law matter involving mother, father, and the minors, and the family law court made a custody modification based on a request by father just one week before a protective custody warrant was issued in this case. Two, "[i]n the dependency context, the juvenile court intervenes to protect a child, not to punish the parent." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.) Thus, in the absence of factual circumstances which justify jurisdiction to protect a child, a perceived or clear attempt by a parent to use the dependency system to move the custody needle in their favor is not enough to justify dependency jurisdiction. The focus needs to be on the physical and emotional well-being of the child, and whether a parent's actions have had or may have a statutorily specified impact thereon.

## II.

### REMOVAL

Because we reverse all the juvenile court's jurisdictional findings, the disposition orders, which include the custody determination challenged by mother and the mandated individual counseling challenged by father, must also be reversed. (See *In re G.Z.* (2022) 85 Cal.App.5th 857, 883.)

### DISPOSITION

The juvenile court's jurisdiction and disposition orders are reversed. The matter is remanded to the juvenile court with directions to vacate those orders and any subsequent orders, and to enter new orders dismissing the petitions.


DELANEY, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


SANCHEZ, J.

31